## Idle v. Commonwealth.

(Decided May 29, 1912.)

### Appeal from Bell Circuit Court.

Homicide—Evidence—Failure of Record to Show Exceptions Were Taken.—Appellant having been jointly convicted with another for the murder of Jim Mays, and his punishment fixed at confinement in the penitentiary for life, has not furnished any reason for reversal of the judgment; the record failing to show that exceptions were taken either to the instructions or the rulings of the court complained of. Consideration of the evidence by this court fails to sustain his complaint of the failure of proof; while the evidence was in large part circumstantial, considered as a whole, it authorized the verdict.

JOHN HOWARD for appellant.

JAMES GARNETT, Attorney General, M. M. LOGAN, Assistant Attorney General for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

The appellant, Roy Idle, was jointly indicted in the Bell Circuit Court, with Charley Balltrip, for the murder of Jim Mays. They were tried together and both found guilty as charged; the punishment of each being fixed by the verdict of the jury at confinement in the penitentiary for life. Judgment was duly rendered as to each in accordance with the verdict. No complaint is made by Balltrip of the judgment, but Roy Idle, being dissatisfied therewith, has appealed.

Mays, the victim of the homicide, was a resident of New Tazewell, Tennessee, from which place he came to Middlesboro, Kentucky, October 30, 1911, having in his possession $70.00. The evidence appearing in the record shows that he was seen in Middlesboro on the afternoon and night of November 3, 1911, and that he disappeared during the night and was not seen again until his body was found in a pond, November 28, 1911, in a suburb of Middlesboro. The body was identified by his father and two of his brothers. There seems to have been no mistake as to the identification; the father and brothers recognized a peculiar scar which had long been on the ankle of the deceased. They also recognized his clothing and, in addition, there was found in a pocket of his clothing a note which had been executed by him, sometime, previously, to a local merchant of New Tazewell, for fertilizer, and which note he was known to have paid shortly before leaving his home for the visit to Middlesboro.

According to the testimony of the father and brothers the deceased was thirty years of age at the time of his death; about five feet eight inches in height and weighed 135 pounds. Following the finding of the body an inquest was held by the coroner of Bell county and, at the post mortem examination made at the inquest, by Dr. J. R. Tinsley, bruises were discovered on the head of the deceased, and it was also found that his neck had been broken. In the opinion of the physician expressed on appellant's trial, the wounds on the head had been made with a blunt instrument; and he was further of the opinion that the death of deceased was caused by the wounds on his head or the dislocation of the neck, or both. Shortly after finding the body of Mays, appellant and his associate, Balltrip, were arrested under warrants charging them with the murder. The facts connecting them with the crime as shown by the evidence on the trial were, in brief, as follows:

Ned Minton, a witness for the Commonwealth, testified that he saw deceased about three p. m. on the 3d of November at the Middlesboro depot; and that from the depot he and deceased went to the home of appellant, who was absent. It is apparent from the evidence that Minton and deceased called at appellant's home to see his wife and another woman, who was staying with her, and that both women were prostitutes. Indeed, it further appears from the evidence that such was the character of appellant's wife before and at the time of his marriage

to her. Minton further testified, that he remained at appellant's house from about four p. m. to six p. m., when he left, but that deceased remained at the house and was not seen alive by Minton again. Minton, however, saw appellant at a saloon, after leaving deceased at his home.

Harry Ford, another witness for the Commonwealth, testified that he lived with his mother on premises adjoining those of appellant and was at his mother's house while Minton and deceased were at appellant's house. Ford also testified that he knew deceased, appellant and Balltrip; that he saw deceased at the home of the appellant on the afternoon in question after Minton had taken his departure; that while standing at his mother's gate that night appellant and Balltrip passed in leaving the former's house while the deceased was there; that as appellant and Balltrip passed him at the gate he heard appellant say he was going to kill the deceased because he believed he had been, "laying up with Minnie," his wife; that these words were spoken to Balltrip and that in reply thereto Balltrip told him he would help him.

On the day following this occurence the boy, Ford, was carried from this State to Tennessee by appellant's brother-in-law and some days later he was, according to his testimony, visited in that State by appellant, who told him not to mention what he had heard appellant say to Balltrip about killing the deceased, that the latter was dead, and, that if he did tell of the statement made by appellant to Balltrip, he, appellant, would kill him.

Lily Peyton, another witness introduced in behalf of the Commonwealth, testified that she lived near appellant and that on the night deceased disappeared, as she was returning to her home from church, between ten and eleven o'clock, she heard appellant's voice, which she recognized, and a commotion in his house which she described as follows:

"I heard a rumbling like some fellow falling over a chair, then I heard some one crying; sounded like a woman's voice; and then some one holler O! Lord, twice, and then a man said, Hush up, G—— D—— you; and then two men came out of the back door of Roy Idle's house with a man between them and the man in the middle was shorter than either one of the others who had hold of his arms."

She identified appellant as one of the tall men, but did not know the other tall man, and the description

which she gave of the smaller man who was being lead by the other two conformed to the description given of the deceased by his father, brothers and other witnesses, who knew him.

This witness also testified that after the three men had come out of appellant's house and gone some distance she heard one of them call, "police;" immediately following which she heard appellant say, "Hush, G—— D—— you."

Hannah Kincaid, also introduced in behalf of the Commonwealth, testified that she too lived near appellant's home; and that on the night in question, after she had returned to her residence from prayer meeting, she heard a man's voice call in distress for the police; and upon looking in the direction of the voice she saw three men standing together; two of them tall men, who seemed to be holding a smaller man between them; that she was well acquainted with the appellant and knew his voice, and she heard him talking to the man who had called for the police whom he told to hush his mouth; that immediately following these remarks she heard two blows that made a noise similar to striking on a barrel, and then heard appellant say to some one that they would come back in the morning and get it. The witness said she did not know to what these remarks referred, but early next morning she went out to the place where she had seen the three men and found the grass much trampled.

Other witnesses saw the three men that night; one of these, Eliza Ready, heard the call for the police and heard appellant, whose voice she recognized, say, "G—— D—— you, shut your mouth." Another of them, Blanch Thomas, also saw the three men, two of them tall men and a smaller man between them. One of the tall men had a stick in his hand. She heard the small man holler in distress and heard him say to the taller ones, "not to do him this way;" to which one of them replied, "they were going to kill him," and the one with the stick in his hand struck him. After this she saw the three men go down the road, and watched them until they got to an elm tree; then she went into her own home. She also went out next morning to the place where she had seen the blow inflicted, and found the grass trampled down and the ground torn up, as if it had been done by persons scuffling. Yet another witness, Cy Bass, testified that he was on the road the night referred to, between ten and eleven o'clock; that upon reaching the neighborhood

of appellant's house he met appellant and two other men whom he did not know; and that appellant and another man had hold of a smaller man walking between them; that as he passed he spoke to them but they did not return his salutation; and that after passing them he stopped and watched them as they proceded down the road which they left and turned off into a corn field. He observed that the smaller and middle man walked as if he were drunk; and that he seemed to be going unwillingly and was pulled along by the other men.

In addition to the witnesses referred to, others were introduced for the Commonwealth who testified as to statements made by appellant which indicated that he knew Mays was dead before the body was discovered.

Appellant and Balltrip testified in their own behalf denying the statements of the Commonwealth's witnesses which tended, in any way, to connect them with the killing of the deceased; each denying that he was at the house of appellant on the night that Mays was there; that they were then on friendly terms or that either of them saw Mays there during the day or night. Appellant claimed to have been absent from his home from eight o'clock in the morning until twelve at night. He admitted, however, an intimate acquaintance with the deceased and that he had frequently played cards with him, but said he did not see him in Middlesboro during his stay there immediately preceding his death. The wives of appellant and Balltrip also testified; the testimony of each being admitted by the court in behalf of the husband of the other. Appellant's wife admitted that deceased was at her house during the afternoon and until eight or nine o'clock of the night fixed by the Commonwealth's witnesses, but denied that Balltrip in company with her husband, or alone, was at her home during that day or night; that he, her husband or other men, were there while deceased was present, or that they carried him from the house. Her testimony was discredited, however, by two witnesses introduced by the Commonwealth, who testified that she told them she was so drunk, the night deceased was said to have been taken from the house and killed, that she did not know anything that occurred. There was also an attempt to establish an alibi through several witnesses introduced by appellant and Balltrip, but the reputations of these witnesses were successfully attacked by others introduced by the Commonwealth; therefore, the alibi was not of a character

to impress the jury with its truth. Our reading of the evidence gives us no reason for disagreeing with the conclusion expressed by the verdict of the jury.

' The grounds relied upon by the appellant in support of his motion for a new trial are:

First: That the court erred in admitting incompetent testimony.

Second: Because of improper conduct both during the trial and in the argument, on the part of counsel representing the Commonwealth.

Third: That the court erred in instructing the jury.

Fourth: Because of newly discovered evidence beneficial to appellant.

As to the first of these grounds it is sufficient to say, that our examination of the bill of evidence fails to disclose that any incompetent evidence was allowed on the trial. It is true appellant's counsel complains that Harry Ford was permitted to testify, but it is not clear on what ground the objection to the testimony is based. Alhough Ford is a negro boy, only ten years of age, he seems to have testified intelligently and honestly. It abundantly appears from the record that an attempt was made by appellant, through his brother-in-law, to get Ford beyond the jurisdiction of the court, and also, that there was an attempt on the part of the appellant himself to intimidate the witness, but it was not made to appear that the testimony given by him was obtained by improper means. On the contrary he seemed to understand the importance of his evidence and to realize the responsibility resting upon him, and much of his testimony was corroborated by other witnesses introduced for the Commonwealth, upon whose statements we have already commented. Moreover, we find that, although his testimony was objected to, no exception was taken by the appellant to the ruling of the court admitting it.

The complaint contained in the second ground for a new trial seems to us to be entirely without merit; neither in the record nor brief of counsel is it made to appear that there was any improper conduct in argument, or at any time during the trial, on the part of counsel representing the Commonwealth; nor does it appear that anything said or done by counsel was objected to by the appellant.

The third ground for a new trial is also without merit. The instructions given upon the trial are free from error. Although they were formally objected to when given,

the brief of counsel for appellant fails to point out any error contained therein.

The fourth ground is without support from the record. It was not made to appear on the motion for a new trial of what the alleged newly discovered evidence consisted of, or from what witness or witnesses it could be obtained. We are therefore lead to conclude that there was really no discovery of new evidence on the part of the appellant.

The record furnishing no reason for disturbing the verdict, it is affirmed.